[Civ. No. 30425.   Second Dist., Div. Four.   Dec. 27, 1967.]

ELWIN E. BUTCHER, Plaintiff and Respondent, v. MARIANO DAUZ et al., Defendants and Appellants.

Block, Toler, Bulloch & Biggerstaff and Ralph A. Biggerstaff for Defendants and Appellants.

Hall & Mirassou and J. B. Mirassou for Plaintiff and Respondent.

FILES, P. J.—Plaintiff, a subdivider and builder, entered into a written agreement to purchase land from defendants, husband and wife. This action was brought for specific performance of the agreement, or in the alternative, for damages. After a trial without a jury the court awarded plaintiff damages in the sum of $6,000. Defendants are appealing from the judgment.

The underlying facts, which are not in substantial dispute, will be outlined first.

Defendant Mariano Dauz owns and farms a tract of about four acres in Los Angeles County. On October 22, 1962, a real estate broker named Holiman solicited and obtained a listing of the property for sale. Holiman then obtained a written offer from plaintiff, set forth on a standard form of deposit receipt, which defendants accepted on November 3, 1962. This document states that the price is $21,000 per acre, of which 29 percent is to be paid in cash and the balance to be secured by a first trust deed, to be subordinated to a construction loan not to exceed $20,000 per lot.

On November 12, 1962, the parties executed escrow instructions, with the First Western Bank and Trust Company as escrow holder. The instructions include this statement: "90 day escrow, although principals agree escrow may be extended

in order to record tract map, however, extension not to exceed date of June 10, 1963.''

Plaintiff then undertook, at his own expense, to apply for a change of zone and for the approval of a subdivision map. Defendants cooperated to the extent of signing certain documents as requested. On April 17, 1963, the county regional planning commission approved a change of zone from M-1 to R-1-5500, as plaintiff had requested. The ordinance of the board of supervisors effectuating the zone change was adopted July 25, 1963. A tentative subdivision map, subdividing the property into 22 lots, received the favorable recommendation of the planning commission on May 21, 1963. No final subdivision map was ever submitted to the board of supervisors for its approval.

Two or three weeks prior to June 10, 1963, Holiman, the broker, delivered to defendants a form of subordination agreement. Defendants did not sign it but referred it to an attorney.

As of June 10, 1963, no money had been paid into the escrow except a $2,500 check which had accompanied the offer. No deed had been executed. Plaintiff had executed a note and ''short form deed of trust.''

On June 10, 1963, plaintiff delivered a letter to the escrow officer wherein he stated, ''I hereby tender to you the sum of $23,751 and it is further offered to execute a promissory note in the sum of $58,149 to be secured by a deed of trust in favor of the sellers. . . .'' The letter further declared that he was informed that the sellers had not performed, and because of this, the deposit of cash would be an idle act.

On June 11, 1963, defendants' attorney wrote a letter to the escrow holder which stated, among other things:

''This letter is to advise you that my clients do hereby rescind and cancel the above numbered escrow.

''. . . .

''My client finds it necessary to take this step for the reason that the subordination agreement presented for his signature is not in accordance with his understanding of the transaction nor in accordance with the escrow instructions. Further, for the reason that he was uninformed at the time of entering into this transaction as to the consequence and to the effect of said transaction. Further, that there has been undue delay in closing this transaction and that the time allowed for closing same has expired and for other reasons too numerous to mention at this time.''

This action was commenced on June 25, 1963. ■ The pleadings and the pretrial order are cast in general language which suggests rather than defines a great variety of issues of fact and law. It is clear, however, that the complaint seeks relief solely upon the express written contract, it being alleged that "plaintiff performed all of the agreements and conditions on his part to be performed," but "defendants have failed and refused to execute a subordination agreement . . . and . . . a deed to said land."

The findings of fact disclose little of how the trial court resolved the many factual issues which appear in the record of the trial. The defendants' written requests for specific findings on some material matters, as contemplated by Code of Civil Procedure section 634, were ignored. The findings do declare "that the plaintiff performed each and every obligation on his part to be performed under said agreement." A "memorandum of opinion" filed by the judge prior to the preparation of the findings, indicates that the damage award of $6,000 was intended to compensate plaintiff for his expenses and services in obtaining a rezoning of the property.

It is unnecessary to analyze all of the problems raised by this unsatisfactory record because it is apparent from the undisputed facts that, if there was an enforceable contract, plaintiff failed to perform his part of it, and hence cannot recover damages for breach of it.

In order to approach the problem it is necessary to interpret the writings whose enforcement is sought. There are two, the deposit receipt and the escrow instructions. Each consists of a printed form, with blanks filled in by words, phrases and partial sentences which are not entirely free of ambiguity. The surrounding circumstances, as shown by the evidence, afford some assistance in understanding what the parties meant by the cryptic phrases they used. ■ Since there is no issue of credibility with respect to any of the significant circumstances surrounding the writings, this appellate court is obliged to examine the record and make its own interpretation. (*Parsons* v. *Bristol Dev. Co.*, 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)

There is reason to doubt that the agreement set forth in the two instruments is sufficiently definite to be enforceable. One of the essentials of the transaction was that the purchase money trust deed was to be subordinated to a construction loan.

■ "Although the parties to a contract of sale containing a subordination clause may delegate to the vendee or third

party lenders power to determine the details of subordinating loans, an enforceable subordination clause must contain terms that will define and minimize the risk that the subordinating liens will impair or destroy the seller's security." (*Handy* v. *Gordon*, 65 Cal.2d 578, 581 [55 Cal.Rptr. 769, 422 P.2d 329].)

The deposit receipt refers to the construction loan only in this language: ". . . said first trust deed and note will be made second to a new construction and or improvement loan, and or loans not to exceed Twenty thousand per lot, said subordination agreement to be furnished by and approved by Title Insurance and Trust Company."

The buyer's instructions to the escrow contain this (in typewriting):

"A purchase money deed of trust securing a Note for the balance of purchase price to be executed by Elwin E. Butcher to seller herein, with interest at 6.6 per annum, principal and interest all due and payable within thirty six months from close of escrow. Said note and deed of trust to contain release clauses together with subordination agreement to a new construction and/or improvement loan and/or loans not to exceed $20,000.00 per lot with interest not to exceed 7.2% per annum. (Note and Deed of Trust to be second to a new construction loan and or improvement loan or loans) SAID SUBORDINATION AGREEMENT TO BE FURNISHED BY AND APPROVED BY THE TITLE INSURANCE AND TRUST COMPANY." (Capitals in original.)

It appears that the amount of the construction loan is limited to $20,000 per lot, but nothing is said about the number of lots. The time and rate of payment of the construction loan are unspecified. (Compare the agreement held to be too uncertain for enforcement in *Kessler* v. *Sapp,* 169 Cal.App.2d 818 [338 P.2d 34].)

There is no allegation and there is no evidence that the parties had in mind any customary form of subordination agreement, which would supply the missing ingredients, as in *Burrow* v. *Timmsen,* 223 Cal.App.2d 283 [35 Cal.Rptr. 668, 100 A.L.R.2d 544]. The only basis for finding definiteness in the contract at bench is to assume that the capitalized sentence in the escrow instructions mean that the parties agreed to accept a subordination agreement prepared by a third party, namely, the Title Insurance and Trust Company. (Compare *Stockwell* v. *Lindeman,* 229 Cal.App.2d 750 [40 Cal.Rptr. 555], where uncertainty was avoided by an agreement to accept the terms required by the lender.) In construing the

language concerning the title insurance company it is important to notice who the parties are. Plaintiff is an experienced subdivider. Defendant Mariano Dauz is a farmer, born in the Philippines, who has never attended a school in this country. When the transaction was first proposed to him he did not know what a subordination agreement was. Mr. Holiman, the broker, brought along an associate who explained it to Dauz in Spanish. The provision of the contract that the subordination would be furnished and approved by a neutral title company would tend to reassure persons such as defendants that the contract would be fairly and properly drawn. ■ Under the circumstances this language of the agreement must be interpreted literally: the subordination agreement must be approved by the Title Insurance and Trust Company for this transaction. There is no basis for any inference that Mr. and Mrs. Dauz had in mind some standard form which was being incorporated into their contract by reference. Mere use of a form prepared for some other transaction, or for general use, would not meet the requirements of the instant contract, when construed in the light of surrounding circumstances.

■ The escrow instructions state that the trust deed to be given by plaintiff is to "contain release clauses together with subordination agreement. . . ." This suggests it was the responsibility of plaintiff to procure such a document. Plaintiff so construed it, and under the circumstances the court so construes it.

Plaintiff testified that a girl in his office typed the subordination agreement which was presented to defendants for signature. Actually two were typed. Each consisted of three typewritten pages containing blanks for the insertion of figures. The two forms are identical except for the figures which were inserted.

The three typewritten pages are obviously an incomplete document. There is a space for signature by the two defendants at the bottom of the third page, but otherwise there is no identification of the parties, the property or the transaction. The text refers to "this deed of trust," indicating that the original draftsman conceived the typewritten pages as a rider to be attached physically to some trust deed.

The first version provides for subordination to a deed of trust not exceeding $450,000 at 10 percent interest; and provides further that after the land has been subdivided, upon reconveyance of the land from the lien of that trust deed, the purchase money encumbrance may be subordinated to a new

trust deed or deeds in an amount arrived at by multiplying the number of lots by $50,814.96.

Plaintiff testified that the first one was a mistake. He directed the girl to type it over. The second version uses the figures $440,000, 7.2 percent, and $58,149 respectively. Plaintiff says the first one never left his office. He believes the second one was sent to defendants.

Defendant Mariano Dauz produced a photocopy of the first one as the one which had been delivered to him.

■ It is unnecessary to resolve the factual conflict. The second version is no better than the first in these critical respects:

(1) There is no evidence that the document had been furnished or approved by the title company for this transaction. Plaintiff did testify "It was an approved subordination by the Title Insurance and Trust which they had sent down, I believe, to Charles Catterlin." Mr. Catterlin is not otherwise identified in the record. The statement that "It was an approved subordination" is a pure conclusion. Even if true, it does not indicate the kind of approval which this contract calls for, for the reasons indicated above.

(2) Nowhere does the document place any limitation upon the purpose of the $440,000 loan. The underlying agreement permits subordination only for construction or improvement purposes.

(3) The underlying agreement does not authorize a loan of $440,000. It says $20,000 per lot. Doubtless this figure was inserted upon the assumption that there would be 22 lots. But as of the time set for close of escrow, the property had not been subdivided at all, and plaintiff was under no obligation to build any particular number of houses. The way the "subordination" reads, plaintiff would be free to use the property as security for any loan up to $440,000, irrespective of the number of lots to be improved.

(4) The refinancing figure—whether $50,814.96 or $58,149 per lot—is not explained by anything in the record. It must have been another stenographic error, but plaintiff has never acknowledged it as such.

■ The letter written by plaintiff on June 10, 1963, offering to perform, can only be read as an offer to perform upon the terms set forth in the subordination agreement which he had sent to defendants for signature. Such an offer is not a tender of the performance due from him under the contract.

█ In *Kessler* v. *Sapp, supra,* 169 Cal.App.2d 818, 823, the appellate court suggested that where the agreement to sell was unenforceable, the intended purchaser might recover, under a theory of unjust enrichment, the reasonable value of any benefits which he conferred upon the owner in attempting to perform the supposed contract. In the case at bench, the memorandum opinion filed by the trial judge indicates he may have had some such theory in mind.

However, the judgment is not for restitution of the value of benefits conferred. The complaint stands only upon the alleged contract. There is no allegation that plaintiff conferred benefits for which defendants should reimburse him. The pretrial statement, broad as it is, lists no issue with respect to unjust enrichment or benefit to the defendants. The findings of fact state that plaintiff performed the contract, defendants breached it, and that plaintiff was damaged in the amount of $6,000. There is also a finding ''That the value of plaintiff's efforts in doing the foregoing is in the amount of $6,000.00.'' If this was intended as a finding of a benefit conferred on defendants, it is out of place. The change of zoning and the tentative subdivision plan may or may not have enriched defendants. The issue was not tried and there was no occasion to try it under the pleadings and pretrial statement.

In *Jones* v. *Sacramento Sav. & Loan Assn.,* 248 Cal.App.2d 522, 532 [56 Cal.Rptr. 741], the appellate court gave the appellant the benefit of a theory of unjust enrichment which had not been pleaded. The opinion points out that all pertinent evidence on that subject was in the record, and showed without conflict that there had been unjust enrichment. No such statement can be made with respect to the record at bench.

The judgment is reversed.

Jefferson, J., and Kingsley, J., concurred.