[Civ. No. 60041. Second Dist., Div. Five. Jan. 27, 1982.]

BRIAN G. HUTTON et al., Plaintiffs and Respondents, v. MIKE GLIKSBERG et al., Defendants and Appellants.

242

## COUNSEL

Miller, Starr & Regalia, Harry D. Miller, Karl E. Geier, Millstone, Berman & Wechsler and Alvin Wechsler for Defendants and Appellants.

Gang, Tyre & Brown and Howard King for Plaintiffs and Respondents.

## OPINION

ASHBY, J.—Plaintiffs Brian G. Hutton and Albert S. Ruddy (hereinafter Buyers) brought this action against defendants Mike and Sheina Gliksberg (hereinafter Sellers) to compel specific performance of a contract for the purchase and sale of real property. The trial court granted a judgment in favor of Buyers, compelling Sellers to convey the property and awarding incidental compensation. Sellers appeal.[1]

On March 3, 1977, the parties executed a written contract for the purchase and sale of an apartment building at 426-428 Spaulding Drive in Beverly Hills, California, for $750,000. They executed escrow instructions dated March 7 which called for escrow to close on or before April 21, 1977, time being of the essence. As of April 21, Buyers had performed their obligations but Sellers had not provided escrow with the necessary documents. On April 22, Sellers, in writing, canceled the escrow. This action followed.

---

[1]Plaintiff Todd Compton, the real estate broker, also sued for his commission. The portion of the judgment awarding Compton the commission is not in issue.

Sellers contend (1) that the contract's terms were not sufficiently certain to be specifically enforced; (2) that Buyers did not adequately tender the purchase price; and (3) that the trial court erred in its award of incidental compensation.

### CERTAINTY OF CONTRACT TERMS

The purchase price of $750,000 was payable as follows: (1) $250,000 cash to be deposited in escrow; (2) Buyers to obtain a new first trust deed loan of $400,000; and (3) Sellers to provide a second trust deed loan of $100,000. The contract and escrow instructions also provided that Sellers were to receive a net figure of no less than $700,000 "regardless of adjustments such as prepayments mortgage penalties, real estate commissions, etc." Sellers contend that the net price provision and the terms of the loans were too uncertain to permit specific enforcement. (Civ. Code, § 3390, subd. 5.) This argument is without merit.

Paragraph 4 of the escrow instructions provides: "Nothing to the contrary herein withstanding [Seller] is to receive a net figure of no less than $700,000.00 regardless of adjustments such as prepayments mortgage penalties, real estate commissions, etc. Escrow holder will be further instructed by Seller." The realtor, Todd Compton, explained the meaning of "adjustments" and "etc." Sellers wanted to be assured that after all charges against Sellers in escrow, Sellers would net $700,000 exclusive of encumbrances. To facilitate the transaction, Compton agreed with Sellers[2] that if the charges against Sellers in escrow, including Compton's $45,000 commission, exceeded $50,000, then Compton would reduce his commission by whatever amount necessary to enable Sellers to net $700,000 exclusive of encumbrances.[3]

The escrow officer, Elaine Berk, testified to the various debits and prorations which would have been charged to the Sellers in escrow had the transaction not been canceled. Without the agreement of the broker, Sellers would have netted $697,906. Thus under the agreement the broker would have been required to reduce his commission by approximately $2,100.

---

[2]Sellers and the broker executed an amended escrow instruction, exhibit 15, relative to the sales commission.

[3]Sellers were also concerned that if Buyers used a lender other than the existing lender, there would be a prepayment penalty. However, Buyers' loan application to the existing lender, Santa Fe Federal Savings, was approved, and there was no problem of a prepayment penalty.

■ Sellers contend the contract and escrow instructions did not adequately specify what elements were to be subtracted in determining the net figure. We disagree. In *King* v. *Stanley* (1948) 32 Cal.2d 584 [197 P.2d 321], a specific performance case in which there was also a provision that the seller was to "net" a certain amount (*id.* at p. 587), the court stated, "There is no merit in the contention that the court could not ascertain with reasonable certainty from the writings of the parties the duty of each and the conditions of performance. Equity does not require that all the terms and conditions of the proposed agreement be set forth in the contract. The usual and reasonable conditions of such a contract are, in the contemplation of the parties, a part of their agreement. In the absence of express conditions, custom determines incidental matters relating to the opening of an escrow, furnishing deeds, title insurance policies, prorating of taxes, and the like." (*Id.*, at pp. 588-589; citations omitted.) Here the "adjustments" were the routine debits and charges made by the escrow officer, and the provision in question was not fatally lacking in certainty.

■ Sellers next argue that the contract is not specific enough as to the terms of the financing. The contract and escrow instructions provided that Buyer would procure a new first trust deed loan in the maximum amount of $400,000 "at current rates and charges" and that Buyers would execute a second trust deed securing a note for $100,000 in favor of Sellers, "due and payable in five (5) years, bearing interest at 1/4% more than the interest for the first trust deed," principal and interest to be amortized for a period of 30 years, payable monthly beginning 30 days after close of escrow.[4]

Sellers contend that, because Sellers were to carry a second trust deed loan, it was necessary that the terms of the first trust deed loan be spelled out with greater specificity in order to protect Sellers' security. Sellers misplace reliance upon a long line of cases involving subordination agreements in real estate development projects.[5] In those cases a

[4]Certain other terms to be included in the second trust deed were also specified.

[5]*Krasley* v. *Superior Court* (1980) 101 Cal.App.3d 425, 430-431 [161 Cal.Rptr. 629]; *Spellman* v. *Dixon* (1967) 256 Cal.App.2d 1, 3-4 [63 Cal.Rptr. 668]; *Magna Development Co.* v. *Reed* (1964) 228 Cal.App.2d 230, 236-237 [39 Cal.Rptr. 284]; *Kessler* v. *Sapp* (1959) 169 Cal.App.2d 818, 823 [338 P.2d 34]; *Roven* v. *Miller* (1959) 168 Cal.App.2d 391, 398 [335 P.2d 1035]; *Gould* v. *Callan* (1954) 127 Cal. App.2d 1, 4-5 [273 P.2d 93]; *Handy* v. *Gordon* (1967) 65 Cal.2d 578, 581-582 [55 Cal.Rptr. 769, 422 P.2d 329, 26 A.L.R.3d 848]; *Butcher* v. *Dauz* (1967) 257 Cal. App.2d 524, 528-529 [65 Cal.Rptr. 166]; *Conley* v. *Fate* (1964) 227 Cal.App.2d 418,

seller would sell land to a developer, the seller taking back a trust deed which the seller agreed would be subordinate to a construction loan to be made by another lender to build improvements on the property. In such circumstances the seller would be in a very precarious position. If, after obtaining the construction loan, the developer failed to build the improvements as planned, or the project was simply unsuccessful and there was a default on the construction loan, the property was likely to be inadequate security for both the construction loan and the subordinate lien of the original seller. The courts were therefore generally unwilling to order specific performance of executory contracts containing a subordination agreement, unless the terms of the construction loan and protections for the seller were spelled out in detail.

The situation in the instant case is entirely different. Sellers did not subordinate their trust deed to a future construction loan far larger than the value of the property. They simply agreed that their trust deed securing a loan of $100,000 would be second to a first trust deed purchase money loan in the amount of $400,000. Sellers were to receive $250,000 cash, the property being worth $750,000, which was more than adequate security for both loans. Unlike the cases cited by Sellers, there were no circumstances calling for extremely strict requirements of specificity as to the terms of the first trust deed loan. (See *Connell v. Zaid* (1969) 268 Cal.App.2d 788, 791-792 [74 Cal.Rptr. 371] [distinguishing the true subordination agreement cases].)

Sellers also suggest that the terms of the second trust deed loan were vague. However, the amount, the period, the amortization rate, and even certain other details were spelled out. The interest rate was to be "1/4% more than the interest for the first trust deed." The interest rate was tied to an external standard, and thus was not fatally uncertain. (See *Burrow* v. *Timmsen, supra,* 223 Cal.App.2d 283, 289-290.)

---

421-422 [38 Cal.Rptr. 680]; *Bruggeman v. Sokol* (1954) 122 Cal.App.2d 876, 881-882 [265 P.2d 575]; *Loeb* v. *Wilson* (1967) 253 Cal.App.2d 383, 389 [61 Cal.Rptr. 377]; see also *Burgess* v. *Rodom* (1953) 121 Cal.App.2d 71, 74 [262 P.2d 335]; *White Point Co.* v. *Herrington* (1968) 268 Cal.App.2d 458, 466 [73 Cal.Rptr. 885]; *Middlebrook-Anderson Co.* v. *Southwest Sav. & Loan Assn.* (1971) 18 Cal.App.3d 1023, 1034 [96 Cal.Rptr. 338]; *Gluskin v. Atlantic Sav. & Loan Assn.* (1973) 32 Cal.App.3d 307, 313 [108 Cal.Rptr. 318]; cf. *Simmons v. Dryer* (1963) 216 Cal.App.2d 733, 743 [31 Cal.Rptr. 199]; *Burrow* v. *Timmsen* (1963) 223 Cal.App.2d 283, 289-290 [38 Cal.Rptr. 668, 100 A.L.R.2d 544]; *Stockwell v. Lindeman* (1964) 229 Cal.App.2d 750, 755 [40 Cal.Rptr. 555].)

## BUYERS' PERFORMANCE

■ Sellers contend they are excused from performance on the ground that Buyers did not adequately tender the purchase price. This argument is wholly without merit.

The first trust deed lender, Santa Fe Federal Savings, sent a letter to escrow April 4, 1977, stating that Buyers' $400,000 loan was approved. Santa Fe Federal's loan agent, Donald Krasne, testified that Santa Fe Federal issued a loan commitment to the escrow; Santa Fe Federal was prepared to disburse to escrow, or to those to whom the funds were to be routed in accordance with the procedure outlined by the escrow officer, $400,000 upon a request from escrow that it do so; Krasne had "enclosed [*sic*] his file" and instructed the home office to disburse the proceeds upon request; and Santa Fe Federal was prepared to loan the $400,000 in question and had waived any requirement that an insurance indorsement be issued and deposited in escrow prior to April 21.

Elaine Berk testified that in her experience as an escrow officer, an institutional lender never actually deposits cash funds with the escrow. Instead, upon request by the escrow officer prior to closing, the lender, after deducting its charges, pays the proceeds to the title insurance company, who pays off existing liens and then forwards the remainder of the proceeds to the escrow.

Sellers contend that nevertheless Buyers were in default because they did not deposit $400,000 cash, in addition to their other cash deposits, in escrow. In light of the above evidence, this argument is absurd. The trial court found that Santa Fe Federal was prepared to deliver loan funds to escrow immediately upon request, that Santa Fe's loan commitment constituted the equivalent of cash for purposes of measuring performance by Buyers, and that Buyers performed in a timely manner all acts required on their part. This finding is amply supported by the evidence. (*Thein* v. *Sticha* (1949) 93 Cal.App.2d 295, 297, 300 [209 P.2d 13].)

## INCIDENTAL COMPENSATION

■ In addition to ordering Sellers to convey the property, the trial court made a monetary award to Buyers, totaling $122,219, to compensate Buyers for the fact that at the time specified for performance in the contract, Buyers had a loan commitment for $400,000 at 9-1/4 per-

cent interest, whereas at the time of the judgment, prevailing mortgage rates were 14 percent.[6] Sellers contend (1) that such compensation may not be awarded incident to specific performance and (2) that even assuming some such compensation is proper incident to specific performance, the formula used by the trial court unrealistically assumes that Buyers will hold the property for 30 years and therefore results in excessive compensation to Buyers.

In California the compensation which may be awarded incident to a decree of specific performance is not for breach of contract and is not legal damages. The complainant affirms the contract and asks that it be performed. Since the time for performance has passed, the court relates that performance back to that date, by treating the parties as if the change in ownership had taken place at that time. Thus the buyer is entitled to the rents and profits from the time the contract should have been performed, and the seller is entitled to an offset for the interest on the purchase money which he would have received had the contract been performed. The process is more like an accounting between the parties than an assessment of damages. (*Ellis* v. *Mihelis* (1963) 60 Cal.2d 206, 219-220 [32 Cal.Rptr. 415, 384 P.2d 7]; *Greenstone* v. *Claretian Theo. Seminary* (1958) 173 Cal.App.2d 21, 29 [322 P.2d 482]; Annot. (1949) 7 A.L.R.2d 1204, 1206; 71 Am.Jur.2d, Specific Performance, §§ 217, 218, pp. 278-282.) Thus, although the courts have occasionally stated that where specific performance is granted, the court may also award such damages as the plaintiff is lawfully entitled to by reason of delay in performance (*Jonas* v. *Leland* (1947) 77 Cal. App.2d 770, 778 [176 P.2d 764]; *Abbott* v. *The 76 Land and Water Co.* (1911) 161 Cal. 42, 47 [118 P. 425]), the only compensation which traditionally has been awarded involves the above adjustments relating to the loss of use of the property or purchase money during the period required to pursue the specific performance remedy. (See, e.g., *Meyer* v. *Benko* (1976) 55 Cal.App.3d 937, 946-947 [127 Cal.Rptr. 846]; *D-K Investment Corp.* v. *Sutter* (1971) 19 Cal.App.3d 537, 549 [96 Cal.Rptr. 830]; *Smith* v. *Schrader* (1926) 80 Cal.App. 478, 488-493 [251 P. 967].) We have found no California case which upholds an

---

[6]This was calculated as follows: Monthly payments on a $400,000 loan for 30 years at 14 percent would be $4,739.49; monthly payments on a $400,000 loan for 30 years at 9-1/4 percent would be $3,290.70. The difference, $1,448.79 per month over a period of 30 years would be $521,564.40. The present value of $521,564.40 payable over 30 years discounted at 14 percent, is $122,219.

award, incident to specific performance, in the nature of the award granted here.[7]

However, we conclude that in the circumstances of this case Buyers should receive compensation for the difference in interest rates. Specific performance is an action in equity. In a world of change, equitable remedies have been expanded to meet increasing complexities. ▇ Equity is not bound by rigid precedent, but has the flexibility to adjust the remedy in order to do right and justice. (*Wuest* v. *Wuest* (1942) 53 Cal. App.2d 339, 346 [127 P.2d 934]; *Times-Mirror Co.* v. *Superior Court* (1935) 3 Cal.2d 309, 331 [44 P.2d 547]. ▇ Recent decisions in other states have approved this sort of award, and we conclude such an award is justified in this case.

In *Godwin* v. *Lindbert* (1980) 101 Mich.App. 754, [300 N.W.2d 514, 515], the court affirmed a judgment of the trial court in specific performance which granted the plaintiff buyers supplemental damages equal to the difference, discounted over a 30-year mortgage, between the payments on an original home mortgage loan commitment at 8-1/2 percent, and the payments on the 11-1/4 percent rate in effect when the trial court awarded specific performance. The court said: "Michigan courts have long recognized that a trial court in equity has the power to protect all of the equities of the parties. The court, in equity, may grant complete relief to a party in the form of specific performance, including an award of damages. In granting specific performance, a trial court may award in its decree such additional or incidental relief as is necessary to adequately sort out the equities of the parties. A trial court should enforce the equities of the parties in such a manner as to put them as nearly as possible in the position that they would have occupied had the conveyance of the real property occurred when required by the contract. [¶] In the instant case, the trial court clearly had within its discretion the authority to grant such additional or incidental relief as it thought necessary. In awarding plaintiffs the difference in the increase of the mortgage interest rates, we find no abuse of that discretion." (Citations omitted.) The Michigan court noted that it was considering an

---

[7]Although it appears that in *Duff* v. *Engelberg* (1965) 237 Cal.App.2d 505, 507, 509 [47 Cal.Rptr. 114], the trial court made a similar award, the propriety of that award was not raised as an issue on that appeal, which was by a third party and which involved entirely different issues.

In a recent case where the trial court had denied such relief, the appellate court rejected without discussion the buyer's arguments for such compensation. (*Erich* v. *Granoff* (1980) 109 Cal.App.3d 920, 927, 932 [167 Cal.Rptr. 538].)

issue of first impression for that state but had no difficulty in confirming the award on equitable principles.

In *Reis* v. *Sparks* (4th Cir. 1976) 547 F.2d 236, 239 (applying Maryland law), the trial court granted specific performance plus damages based on the difference, discounted over a 20-year mortgage, between the 7-1/2 percent loan commitment the buyers had and the 9-1/2 rate subsequently in effect. Citing the broad discretion of the court of equity to award ancillary compensation, the federal appellate court upheld the award, stating: "Apparently, no Maryland case holds specifically that increase in mortgage interest is a proper item for compensating the injured party for the delay in conveying property. But, in view of the fact that the sellers were advised of the buyers' plans to finance the purchase, and the fact that the sellers adamantly refused to make the conveyance after having such knowledge, we do not believe the Maryland courts would consider such an award to be an abuse of discretion as defined in Maryland."

In *Regan* v. *Lanze* (1975) 47 App.Div.2d 378 [366 N.Y.S.2d 512],[8] the appellate court upheld the trial court's award in a specific performance case of compensation for increased mortgage interest costs of 1/2 percent over 25 years, stating, "This additional cost is a predictable consequence arising out of delay in conveying title." (366 N.Y.S.2d at p. 516.)

Finally, in *Home America, Inc.* v. *Atkinson* (Fla.App. 1980) 392 So.2d 268, 270, the appellate court held that the trial court should have awarded the buyer, in a specific performance case, damages for the difference between the 29-year 9.75 percent commitment to the buyer and the later higher interest rate.

Turning to the facts of the instant case, Sellers obviously knew that the purchase was being financed because the contract provided for Buyers to procure a new first trust deed loan for $400,000 at current rates and charges, and for Sellers to provide a $100,000 second trust deed loan with an interest rate 1/4 percent more than the interest on the first trust deed loan. The first trust deed lender, Santa Fe Federal Savings, notified escrow on April 4, 1977, that the loan had been approved. We reject Sellers' contention that it was not reasonably within the contem-

---

[8]Reversed on other grounds (1976) 40 N.Y.2d 475 [387 N.Y.S.2d 79, 354 N.E.2d 818].

plation of the parties that if Sellers delayed or refused to convey the property, Buyers could be subjected to a higher interest rate. (*Regan v. Lanze, supra*, 366 N.Y.S.2d 512, 516; *Christensen v. Slawter* (1959) 173 Cal.App.2d 325, 329, 334-335 [343 P.2d 341, 74 A.L.R.2d 567].) We do not agree with Sellers that this increased cost is remote and collateral to the contract, as was found with respect to the buyers' increased cost of renting other premises in *Smith* v. *Schrader, supra*, 80 Cal.App. 478, 493.

Buyers will suffer this increased cost because Sellers failed to perform their obligation to convey the property. If Buyers do not receive compensation for this cost, their remedy of specific performance may be prohibitively expensive and thus rendered nugatory. Equity should not permit such a result.

Moreover, in this case, Sellers were to make a $100,000 loan at an interest rate 1/4 percent higher than Buyers' rate on the first trust deed loan. By refusing to perform until a later time when interest rates are much higher, Sellers obtain a higher rate of return on their loan. In effect, Sellers would profit by their own wrong. Equity cannot permit this. (Civ. Code, § 3517.)

Thus we conclude that the trial court was empowered to grant compensation to Buyers, incidental to specific performance, for the differential in interest rates. Sellers contend, however, that the formula used by the trial court to calculate such compensation (see fn. 6, *ante*) was erroneous. Sellers argue that Buyers will not actually suffer the amount of damages calculated by the court unless Buyers hold the property for the entire 30-year term of the loan, and that Buyers can reap a windfall profit at the expense of Sellers by reselling the property any time sooner than 30 years. We disagree.

In *Miller* v. *Hassen* (1960) 182 Cal.App.2d 370 [6 Cal.Rptr. 202], the defendants committed a fraud upon the plaintiffs by misrepresenting the amount due on a note secured by a deed of trust. In order to prevent a foreclosure sale, the plaintiffs had to arrange a refinancing of the property. As part of the compensatory damages for fraud, the court awarded plaintiffs the differential between the interest rate of the alleged first trust deed and the refinancing of the first trust deed. On appeal the court stated: "Defendants argue that if plaintiffs resold the hotel after foreclosure and refinancing, they would no longer be obligated to pay the increased interest and, therefore, not entitled to recover it.

The answer is obvious. In case of a sale, plaintiffs' damages by reason of a higher interest rate would have been reflected in a lower purchase price. Plaintiffs' damage in this regard was occasioned upon obtaining a new loan at the higher rate of interest and the fact or date of resale was immaterial. We find no merit in the appeal." (*Id.*, at p. 380.)

Similarly here, if in the future Buyers resell the property subject to a 14 percent or higher loan, they will get a lower purchase price than if they could resell the property subject to a 9-1/4 percent loan.

In each of the out-of-state cases where incidental compensation for the differential in interest rates was allowed, the amount was calculated on the present value of the differential over the whole term of the proposed mortgage. (*Godwin* v. *Lindbert, supra*, 101 Mich.App. 754 [300 N.W.2d 514, 515]; *Reis* v. *Sparks, supra*, 547 F.2d 236, 239; *Regan* v. *Lanze, supra*, 47 App.Div.2d 378 [366 N.Y.S.2d 512, 516]; *Home America, Inc.* v. *Atkinson, supra*, 392 So.2d 268, 270.) Furthermore, we foresee tremendous practical difficulties in attempting to fashion a remedy which would involve Sellers in providing partial financing to Buyers over an indefinite period of time or which could require the parties to come back to court if Buyers resold or refinanced the property. (See *Home America, Inc.* v. *Atkinson, supra.*) We conclude the trial court acted properly in calculating the amount of compensation.

The judgment is affirmed.

Stephens, Acting P. J., and Hastings, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 15, 1982. Kaus, J., did not participate therein. Mosk, J., was of the opinion that the petition should be granted.