[No. B008075. Second Dist., Div. Five. May 15, 1985.]

BONIFACIO BRAVO et al.,
Plaintiffs, Cross-defendants and Respondents, v.
PARI JESSICA WEGNER BUELOW,
Defendant, Cross-complainant and Appellant.

COUNSEL

Ronald S. Sofen for Defendant, Cross-complainant and Appellant.

Michael R. Totaro, Maureen J. Shanahan, Totaro & Shanahan and Lucille J. Boston for Plaintiffs, Cross-defendants and Respondents.

OPINION

EAGLESON, J.— In this case we hold that the purchaser of real property, as an incident to an underlying decree of specific performance, is entitled to compensation for increased costs of intended construction of a home occasioned by the seller's delay in conveying title.

## FACTS

In 1978, appellant (seller) and respondent (buyer) entered into a written contract of purchase and sale of an unimproved residential lot in Bel Air, California.

In order to facilitate the transaction, the parties entered into a written escrow. The purchase price was $93,000; $27,000 down and the balance to be evidenced by a note secured by a deed of trust with a due date in two years. On the escrow closing date, June 17, 1978, respondent tendered a check for the amount of the agreed down payment but appellant refused to sign the escrow instructions or complete her part of the transaction.

Respondent sued appellant for specific performance and breach of contract. Appellant answered and cross-complained against respondent for reformation and against the real estate broker for fraud. The broker cross-complained against appellant for a sales commission.

After a court trial, respondent was awarded a judgment of specific performance. In addition, the court found: ". . . that the plaintiff buyer [respondent] is entitled to an offset allowance of increased building costs from $40.000 [sic] square foot in 1978 upward to $60.00 per square foot in June, 1983, or $20.00 per square foot times 3500 square feet—$70,000.00."

Although the broker prevailed on its cross-complaint, and appellant took nothing on her cross-complaint, she appeals only from that portion of the specific performance judgment decreeing that respondent purchaser is entitled to $70,000.

## DISCUSSION

During the trial respondent testified that in 1978 he was involved in the construction of residential buildings and built a duplex that year. In 1979, he built a four-unit condominium. He testified further that these buildings cost approximately $42 per square foot to build.

Penn, respondent's expert, testified that at the time of trial in 1983, building costs had risen 31.8 percent since 1978.

Appellant's expert, Condit, testified that building costs were $40 per square foot in 1978, and $60 per square foot at the time of trial in 1983.

Respondent testified that he intended to build a residence on the lot of "[a]bout 35 to 4,000 square feet." Other testimony, although conflicting, confirms that there were 2,000 to 4,000 square foot homes in the area, and that Penn, respondent's expert, had seen house plans. Respondent testified that he believed the home would cost approximately $150,000 to build and

that he had $100,000 in the bank with which to make the $27,000 down payment on the lot and partially defray initial construction costs.[1]

In a document entitled "Multiple Listing Service, Contract of Sale and Deposit Receipt," respondent reserved the right as a condition of purchase that he "obtain a soil report to his satisfaction and approval within 30 days of acceptance of this offer." Appellant signed the reverse side of this instrument which, inter alia, contained the following: "All terms are exceptable [*sic*] on the reverse side accept [*sic*] the following: . . ."

Appellant generally contends there is no evidentiary support in the record for the $70,000 damages award in favor of respondent for increased construction costs.

"With rhythmic regularity it is necessary for us to say that where the findings are attacked for insufficiency of the evidence, our power begins and ends with a determination as to whether there is *any* substantial evidence to support them; that we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom." (*Overton* v. *Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757]; italics in original; disapproved on other grounds in *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866, fn. 2 [44 Cal.Rptr. 767, 402 P.2d 839].)

Appellant specifically attacks the finding that respondent intended to construct a home of 3,500 square feet. Bravo, the respondent, testified that he planned to build a home of "[a]bout 35 to 4,000 square feet." The evidence clearly supports the view that this language meant a 3,500 to 4,000 square foot house. This was the interpretation placed on this evidence by the trial court when on the following day, in ruling on other evidence, it stated: "That, at least in the judgment of the court, does not indicate any rational relationship to a house of 3500 to 4000 square feet."

Appellant further asserts that there is no evidence in the record that respondent took any concrete steps toward formulating a plan to construct a residence on the property. There are no bids, no estimates, no geological reports, no surveys, no blueprints, no sketches, no drawings, no maps or anything else which would substantiate the finding in the judgment that there was to be a 3,500 square foot house constructed. The answer to these as-

---

[1]Appellant argues that respondent should not recover for "delay costs" of construction because these damages were not specifically plead. However, on two separate occasions during trial, respondent's counsel advised the court he was seeking "delay" damages. The case was tried on that theory by both sides without objection. There was no error.

sertions is that the failure to produce the type of evidence adverted to merely impacts on the other evidence that was introduced, and the weight that evidence was to be afforded by the trial court. Also, many of these pre-building analyses could not be readily completed without full and unrestricted possession of the lot. Given a currently active builder, with $100,000 cash on hand, a set of plans and approval of a soil report as condition precedent to consummation of the sale, there was sufficient evidence before the trial court to conclude that respondent had the intent, ability and necessary financing after conveyance of title to begin construction within a reasonable time.

Appellant further posits that there is no evidence in the record that the increase in construction costs should have been measured from June 1978. She continues that the trial court's award presupposes that respondent would have commenced construction in 1978 at the time the escrow was to close, so that his damages would run from that time. She argues that based on certain testimony, respondent did not intend to commence construction for a minimum of 18 months after the close of escrow, and may not have started to commence construction until such time as appellant's note secured by deed of trust on the property was paid off, which was to have been two years after the close of escrow. Therefore, the appropriate starting date from which to measure the increase in construction costs should be 1980 rather than 1978.

Since appellant refused to convey the lot to respondent, he was not in a position to finalize plans, secure permits, enter into subcontracts or commence construction. Agreements with subcontractors would have stabilized many of the construction costs. We will not speculate what might have happened if respondent had been in a position to move forward.

Appellant next complains there is insufficient evidence to support the trial court's finding that the cost of construction was $40 per square foot in 1978. Since the appellant's expert himself testified this was the square foot cost at that time, this argument is without merit.[2]

■■■ Appellant's major contention is that there is no California precedent for allowing increased costs of intended construction as an incident to a decree of specific performance. In short, he argues that as a matter of law increased costs of construction are not permitted.

---

[2]Appellant argues that the evidence on construction costs does not address the issue of the type of construction contemplated by respondent. *Appellant's expert,* Condit, testified that he used the category of "good plus" construction in his calculations, one of six categories he could have chosen. There is nothing in the record to suggest this is inappropriate.

The general rule and underlying rationale for an award of compensation as an incident to a decree of specific performance are discussed in American Jurisprudence 2d. "Undoubtedly, where a purchaser of land is awarded the specific performance of his purchase contract, he is entitled to an allowance for what he has lost by reason of the vendor's delay in conveying the property. In some cases, this allowance is referred to, loosely or otherwise, as 'damages.' According to most courts, this is not an accurate statement of the principle on which the court acts. The compensation awarded as incident to a decree for specific performance is not for breach of contract and is therefore not legal damages. The complainant affirms the contract as being still in force and asks that it be performed. He cannot have it both ways, performed and broken. It follows from this theory of the remedy by decree of specific performance that damages as such and as at law for breach of contract by the vendor, in not conveying the property at the time fixed by the contract, are not recoverable by the purchaser as supplementary to the decree, because inconsistent with the retrospective erasure of the breach. The situation is simply that, if the court orders it to be performed, the decree must as nearly as possible order it to be performed according to its terms, and one of those terms is the date fixed by it for its completion. This date having passed, the court in order to relate the performance back to it, equalizes any losses occasioned by the delay by offsetting them with money payments. The true rationale of decision in respect of compensation for delay is that the contract is being enforced retrospectively and the equities adjusted accordingly. In reality, therefore, the result is more like an accounting between the parties than like an assessment of damages." (71 Am.Jur.2d, Specific Performance, §§ 217, 218, pp. 278-282.)

"In California the compensation which may be awarded incident to a decree of specific performance is not for breach of contract and is not legal damages. The complainant affirms the contract and asks that it be performed. Since the time for performance has passed, the court relates that performance back to that date, by treating the parties as if the change in ownership had taken place at that time. Thus the buyer is entitled to the rents and profits from the time the contract should have been performed, and the seller is entitled to an offset for the interest on the purchase money which he would have received had the contract been performed. The process is more like an accounting between the parties than an assessment of damages. (*Ellis* v. *Mihelis* (1963) 60 Cal.2d 206, 219-220 [32 Cal.Rptr. 415, 384 P.2d 7]; *Greenstone* v. *Claretian Theo. Seminary* (1958) 173 Cal.App.2d 21, 29 [322 P.2d 482]; . . .)" (*Hutton* v. *Gliksberg* (1982) 128 Cal.App.3d 240, 248 [180 Cal.Rptr. 141].)

In *Ellis,* plaintiff entered into a contract with defendant to purchase a working ranch upon which a home was built. Defendant learned before

entering into the contract that plaintiff intended to exchange the ranch for someone else's property. Plaintiff obtained a decree of specific performance for defendant's failure to complete the transaction and the trial court additionally awarded plaintiff the profits on ranching operations, the rental value of the home on the ranch, and interest of 7 percent on $35,000 for seven months, which was a portion of the purchase price which plaintiff left in escrow for that period of time. The case was reversed, however, because of the failure of the trial court to allow an appropriate offset to defendant seller.

In *Hutton*, the seller refused to convey title and the buyers were awarded a decree of specific performance. The purchase price of real property was $750,000 payable as follows: (1) $250,000 cash to be deposited in escrow; (2) buyers to obtain a new first trust deed loan of $400,000; and (3) sellers to provide a second trust deed loan of $100,000. At the time that the transaction was to close, buyers had a first trust deed loan commitment for $400,000 at 9¼ percent interest, which the sellers were aware of, whereas at the time of judgment, prevailing mortgage rates were 14 percent. The court in *Hutton* "conclude[d] that in the circumstances of this case Buyers should receive compensation for the difference in interest rates. Specific performance is an action in equity. In a world of change, equitable remedies have been expanded to meet increasing complexities. Equity is not bound by rigid precedent, but has the flexibility to adjust the remedy in order to do right and justice." (*Id.*, at p. 249.)

The rule that compensation incident to a decree of specific performance is different in kind than damages for breach of contract, and that the right of recovery is predicated on equitable principles of accounting, is reflected in holdings that a defaulting *seller* is entitled to offsetting credit against compensation awarded to a successful plaintiff purchaser. These offsets are allowed notwithstanding the absence of purchaser's knowledge that they are being accrued for the defaulting seller's benefit during the delay period solely caused by his failure to convey title. Examples are:

Taxes and other authorized expenses. (*D-K Investment Corp.* v. *Sutter* (1971) 19 Cal.App.3d 537, 549, 550 [96 Cal.Rptr. 830].) Ordinary expenses of operation of an apartment building during the delay period. (*Chan* v. *Smider* (1982) 31 Wn.App. 730 [644 P.2d 727, 731-732].) "[T]he court must give credit to *either party* for such expenditures that it has occasioned in relation to the property, such as taxes, assessments, insurance premiums, repairs and the like." (*Bush* v. *Cathey* (Tenn.App. 1979) 598 S.W.2d 777, 782 [11 A.L.R.4th 881]; italics added.) "[A]n accounting should be had which should take into consideration, among other things, the following: the rents received by defendants during the period from the date of the

conveyance of the title to the premises; any profits resulting to the defendants in their operation of the property; any losses sustained by the plaintiff because of the delay in conveyance of title; necessary expenses incurred by the defendants in the operation of the property, such as payments of principal and interest on the mortgage, property taxes, insurance, and minor repairs; the benefits to the plaintiff in retaining the use of the purchase money during the pendency of the litigation." (*Duane Sales, Inc.* v. *Carmel* (1977) 57 App.Div.2d 1003 [394 N.Y.S.2d 307, 308]; rev. on other grounds, *Duane Sales, Inc.* v. *Carmel* (1980) 49 N.Y.2d 862 [427 N.Y.S.2d 930, 405 N.E.2d 175].)

A defaulting seller is also entitled to interest on the purchase money: (1) The legal rate of interest is the measure of compensation as to the purchase money unless the contract specifies a different rate. (*Walker* v. *Benton* (Fla.App. 1981) 407 So.2d 305, 307.) (2) "[W]hen specific performance is ordered and a plaintiff seeks an award of lost rents or profits, the vendor who wrongfully withholds conveyance of property is entitled to credit for actual interest earned on the purchase money retained by the purchaser, if any." (*Eliason* v. *Watts* (Utah 1980) [615 P.2d 427, 431].) (3) The trial court should allow the defaulting seller "an amount which would represent the interest on the purchase price." (*Re* v. *Wells Fargo Bank* (1969) 269 Cal.App.2d 783, 788 [75 Cal.Rptr. 367].) (4) A defaulting seller is entitled "to the interest upon the total purchase price from the date on which the conveyance should have occurred." (*Meyer* v. *Benko* (1976) 55 Cal.App.3d 937, 946 [127 Cal.Rptr. 846].)

■ Compensation as an incident to specific performance need not be limited by contract concepts of foreseeability, so long as said compensation is reasonable. In contrast, however, damages for breach of contract "must be reasonable . . . and the promisor is not required to compensate the injured party for injuries that he had no reason to foresee as the probable result of his breach when he made the contract." (*Coughlin* v. *Blair* (1953) 41 Cal.2d 587, 603 [262 P.2d 305].)[3]

In any event, there is evidence to support the inference that appellant knew that respondent was considering construction when at the time of entering into negotiations she accepted the "Multiple Listing Service, Contract of Sale and Deposit Receipt" in which the respondent specifically conditioned completion of the sale upon securing a soil report satisfactory to him and indicating his approval thereof within 30 days.

---

[3]Although not pertinent here, and not addressed by either counsel, appellant was allowed certain offsets.

There are other inferences that can be drawn from respondent's insistence on a soil report, but "[w]hen two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) By its decision, the trial court drew the inference that respondent intended to commence construction shortly after receiving title to the lot. There is no error.

DISPOSITION

The judgment is affirmed.

Feinerman, P. J., and Ashby, J., concurred.