[No. G037200. Fourth Dist., Div. Three. Feb. 7, 2007.]

MANDEEP BEHNIWAL et al., Plaintiffs and Respondents, v.
GENE C. MIX et al., Defendants and Appellants.

COUNSEL

Law Offices of Michael G. York and Michael G. York for Defendants and Appellants.

Law Offices of Barry A. Ross and Barry A. Ross for Plaintiffs and Respondents.

OPINION

SILLS, P. J.—

## I.  BACKGROUND

This appeal raises the question of what is properly "incidental" to a grant of specific performance. The background facts may be quickly stated: There was a contract to sell a family residence. The sellers reneged. The buyers sought specific performance. The trial court denied it. The buyers appealed. This court reversed. We directed the trial court to grant the buyers' request and enter a judgment granting them their requested specific performance. (See *Behniwal v. Mix* (2005) 133 Cal.App.4th 1027, 1046 [35 Cal.Rptr.3d 320].)

On remand, however, the trial court added this twist to the judgment:

—not only are the sellers (the Mixes) to convey the property to the buyers (the Behniwals), and

—not only are the buyers to recover their attorney fees, but

—the buyers are to *deduct* the amount of their attorney fee award directly from the purchase price of the property.

Since the attorney fee award was over $250,000, and the purchase price of the property was $540,000, the practical effect of the judgment now under

review is to reduce the consideration the sellers will receive for their property to less than $290,000. The sellers have appealed from that part of the judgment. (They also raise a less novel issue regarding the proper calculation of the attorney fees which is dealt with in part IV. of this opinion.)

We thus deal mainly in this appeal *not* with the right to compensation or the attorney fee award as such. Rather, we deal with the *enforcement mechanism* of that right. In effect, by providing for a direct offset against purchase price, the trial court converted what would be, at best, the basis for a judgment lien against all the sellers' property into a preexisting special lien with super-priority over all other liens on this particular property. (See *Isaac v. City of Los Angeles* (1998) 66 Cal.App.4th 586 [77 Cal.Rptr.2d 752] (*Isaac*) [municipality could not validly give its liens for unpaid utility bills priority over all other liens, including tax liens].)

■ After canvassing the relevant authorities, particularly *Isaac, supra*, 66 Cal.App.4th 586, and *Bank of San Pedro v. Superior Court* (1992) 3 Cal.4th 797 [12 Cal.Rptr.2d 696, 838 P.2d 218] (*Bank of San Pedro*) [attorney fees awarded pursuant to contract are not truly "incidental" to judgment], we are forced to conclude that the trial court erred as a matter of law[1] in allowing the buyers to deduct their attorney fees off the top of the purchase price. We reverse the judgment to the degree that it so provides.

## II. A REVIEW OF AUTHORITIES DEALING WITH MONETARY RELIEF INCIDENTAL TO SPECIFIC PERFORMANCE

We look first at the authorities dealing with the provision of monetary relief of some sort as an "incident" to a grant of specific performance. (See generally 13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 27, p. 315 et seq.) Segueing to our conclusion, however, we find that these cases focus on the rectitude of a given award of monetary relief as such. They do not discuss whether provision for the enforcement of that monetary relief by way of *direct offset against the purchase price* was itself appropriate.

*Ellis v. Mihelis* (1963) 60 Cal.2d 206 [32 Cal.Rptr. 415, 384 P.2d 7] (*Ellis*) raised issues of accounting (and offsetting) for profits, given that the land involved was ranch land, with vineyards on it. There was a contract to buy

---

[1] As we show below, even though this is a proceeding in equity, the inclusion of the off-the-top provision for the buyers' attorney fees was legally impermissible. The trial court had no authority to do it *at all*. Therefore we do not characterize inclusion of the off-the-top provision in the judgment as an abuse of discretion. The binary and legal nature of the issue makes the appropriate standard of review de novo.

the land for \$165,000, consisting of a \$5,000 deposit, a \$30,000 downpayment, and a \$130,000 interest bearing note to be paid in specified installments. But after the contract was signed by one of the two owners, a frost damaged the vineyards in the area except for those of the land at issue in the case, making that land more valuable. The signing owner reneged, and the buyer sought specific performance (against both owners[2]). The trial court granted specific performance, but the passage of time and the fact that there were valuable crops on the land created, as the Supreme Court would later characterize them, "accounting" problems. (*Id.* at p. 220 ["The result is more like an accounting between the parties than like an assessment of damages."].)

In adjusting for the passage of time, the trial court's judgment, in addition to specific performance, also gave the buyer:

—the profits of the operation (i.e., the harvest), but minus the value of the services of the signing seller as ranch manager;

—the rental value of a home on the ranch;

—interest on the deposit and downpayment.

But, as an "offset" against those three items, the seller was given interest on the \$130,000 in the installments that would have been received if the installments had been paid. However, the trial court did not award interest on the installments after the due dates in the agreement. The total "damages" for the buyer came to about \$25,000, which the trial court directed "be deducted from the purchase price." (*Ellis, supra*, 60 Cal.2d at p. 220.)

To reiterate, the Supreme Court's opinion was not concerned with the propriety of allowing the net result of the various credits and offsets to be deducted from the purchase price. Rather, its concern was with the proper ascertainment of those credits and offsets, and specifically whether the interest credited to the seller was too low, i.e., whether the seller should have been "permitted to offset against the profits [the] interest on the entire purchase price." (*Ellis, supra*, 60 Cal.2d at p. 220; see also *id.* at pp. 221–222 ["It follows from these principles that the court erred in not permitting an offset against the profits of interest on \$130,000 for the seven-month period that \$35,000 of the purchase money was kept in escrow and on the entire purchase price for the remainder of the delay. It was also error to award

---

[2] We will skip over the problem in *Ellis* that the property was owned by two brothers, one of whom didn't sign and against whom the Supreme Court would hold was no enforceable contract.

plaintiff interest on the $35,000 placed in escrow because, as we have seen, he would have been deprived of the use of that money had the contract been timely performed."].)

Next there is *Dennis v. Overholtzer* (1961) 191 Cal.App.2d 791 [13 Cal.Rptr. 110] (*Dennis*). *Dennis* was not even an appeal from a judgment granting specific performance. Rather, the precise issue in *Dennis* was whether an order allowing an offset of costs later incurred in subsequent appeals against the purchase price was an impermissible change in a judgment *already final*. (See *id.* at p. 797.) Specifically, the *Dennis* decision held that the subsequent order, allowing a buyer to offset the costs of printing reply briefs in two previous appeals from the purchase price to be deposited in the process of specific performance, was *not* such a change in the judgment. The order allowed the buyer to deduct about $658 for the briefs, plus another $77 in otherwise undescribed "costs in the hearing" from a contract purchase price of, in round figures, $18,270, so that the buyer only had to pay the "net sum" of about $17,535. (*Id.* at pp. 793–794.) The appellate court approved the reduction as *not* "changing substantial terms of the judgment," but rather "merely provid[ing] for the deduction of the costs which were incidental to the judgment." (*Id.* at p. 797.)[3]

It is worth noting that the *Dennis* court relied on *Kamper v. Mark Hopkins Inc.* (1947) 78 Cal.App.2d 885, 887 [178 P.2d 767], a decision made in the context of whether an appeal was untimely. In *Kamper*, the original judgment was filed in late November, but the trial court entered an order taxing (reducing) costs and modifying the judgment to conform it to the reduction of costs in early December. The notice of appeal would have been timely if dated from the December modification of the judgment, but was untimely if dated from the November original judgment. The appellate court concluded that the original judgment was the " ' "real" ' " one because it was the judgment " ' "passing upon the matter directly involved in the litigation." ' " (*Id.* at pp. 887–888.) The modified judgment, by contrast, merely "set out the true amount of costs as taxed," which were "a mere incident to the judgment

---

[3] Here is the critical text from the *Dennis* decision: "The judgment awarded respondent . . . her costs of trial, but the cost of a prior appeal was not inserted or offset in the judgment against the amount to be deposited by her. We feel that respondent . . . was entitled as a matter of right to offset against the sum payable in escrow costs which had been allowed. 'It has been repeatedly held that the allowance of costs is a mere incident of the judgment on the merits.' *Kamper v. Mark Hopkins Inc.*, 78 Cal.App.2d 885, 887 [178 P.2d 767, 768], citing cases. The offsetting of the costs against the required escrow deposit did not have the effect of changing substantial terms of the judgment. It merely provided for the deduction of the costs which were incidental to the judgment. (On this subject matter see 20 C.J.S. [Costs] §§ 431, 433.) Therefore, this case does not come within the rule declaring that a trial court cannot amend a judgment once entered if the error sought to be corrected is a judicial one as distinguished from mere clerical errors and misprisions in the judgment." (*Dennis, supra,* 191 Cal.App.2d at p. 797.)

already entered." (*Id.* at p. 888.) Thus the appellant in *Kamper* had filed her notice of appeal too late, and the appellate court dismissed it.

The next offset case is *Bravo v. Buelow* (1985) 168 Cal.App.3d 208 [214 Cal.Rptr. 65] (*Bravo*). *Bravo* involved an unimproved lot in Bel Air, on which the buyer, a builder himself, intended to build a residence. There was a refusal to convey, which was the act setting up the lawsuit. In granting a decree of specific performance, the court also ruled that the buyer was entitled to an "offset allowance" for the increase in building costs during the pendency of the litigation. (*Id.* at p. 210.) The seller attacked both the evidence supporting the *calculation* of the construction cost differential (see *id.* at pp. 211–212) and the more basic legal question of whether some sort of an allowance for "increased costs of intended construction" could be given in the first place (*id.* at pp. 212–214). It was in the context of the latter issue that the *Bravo* court justified not only the buyer's entitlement to the allowance as such, but, in passing, also described the allowance for increased costs of construction as an "accounting" offset against the purchase price. (See *id.* at pp. 214–215.[4])

*Bravo* brings us to *Hennefer v. Butcher* (1986) 182 Cal.App.3d 492 [227 Cal.Rptr. 318], which involved an allowance for the additional costs of reobtaining governmental approvals to build on vacant property in an urban area. The trial court awarded $150,000 "for incidental damages due to delay" consisting of the direct expense of obtaining the approvals plus carrying costs for the time it would take to reobtain the necessary approvals. (*Id.* at p. 499.) The judgment granting specific performance also provided for payment by the buyers of the price minus the $150,000 in incidental damages. (*Id.* at pp. 499–500.)

Once again there was no challenge on appeal to the direct application of the award against the price. Indeed, apropos the "accounting" approach of *Bravo*, the defaulting seller's challenge was to the *absence* of an offsetting

---

[4] The *Bravo* court laid its foundation by making the point that "an award of compensation as an incident to a decree of specific performance" is justified as an "incident" to the specific performance decree itself and " 'is not for breach of contract and is therefore not legal damages.' " (*Bravo, supra,* 168 Cal.App.3d at p. 213; see generally *id.* at pp. 213–214.) Then came this passage, perhaps best expressing the court's most direct thinking on the topic: "The rule that compensation incident to a decree of specific performance is different in kind than damages for breach of contract, and that the right of recovery is predicated on equitable principles of accounting, is reflected in holdings that a defaulting *seller* is entitled to offsetting credit against compensation awarded to a successful plaintiff purchaser. These offsets are allowed notwithstanding the absence of purchaser's knowledge that they are being accrued for the defaulting seller's benefit during the delay period solely caused by his failure to convey title. Examples are: [¶] Taxes . . . . Ordinary expenses of operation . . . . '[P]roperty taxes, insurance, and minor repairs . . . .' [¶] A defaulting seller is also entitled to interest on the purchase money . . . ." (*Id.* at pp. 214–215.)

award of the interest the seller lost during the delay. (See *Hennefer v. Butcher, supra*, 182 Cal.App.3d at p. 505.) The court simply held that the seller waived the issue. (*Id.* at pp. 505–506.)

A case that the buyers in the case before us now include as one of the offset line is *Hutton v. Gliksberg* (1982) 128 Cal.App.3d 240 [180 Cal.Rptr. 141] (*Hutton*), which arose directly out of the extraordinary increase in interest rates in the late 1970's and early 1980's. There, the successful would-be buyer not only obtained an order requiring the conveyance of the property, but an "award" of "[i]ncidental [c]ompensation" consisting of the present value of the *increase in interest rates* on the loan which the buyers contemplated taking out to buy the property. (*Id.* at pp. 247–249.) The sum amounted to about $122,000—calculated on a $400,000 loan over 30 years—as against a purchase price $750,000. As in *Bravo*, the court justified the award as "incident" to the performance decree and "not for breach of contract." (*Hutton, supra*, 128 Cal.App.3d at p. 248.)

However, it is by no means clear from the *Hutton* opinion that the award of $122,000 was to be a direct offset or setoff (neither word appears in the decision) against the purchase price or simply an order of the court, otherwise enforceable in the normal course. The award was initially introduced to the reader as a "judgment in favor of Buyers, compelling Sellers to convey the property and awarding incidental compensation." (*Hutton, supra*, 128 Cal.App.3d at p. 243.) The award was later described as a "monetary award" (*id.* at p. 247) and as a "grant [of] compensation" after that (*id.* at p. 251). A later and unrelated case involving authority of respective judges on a trial court to sign a judgment involving a partnership accounting, *Armstrong v. Picquelle* (1984) 157 Cal.App.3d 122, 129 [203 Cal.Rptr. 552], described the compensation in *Hutton* as "damages" and italicized the word *damages* for emphasis.

In short, even if the (rather large) provision for "incidental compensation" in *Hutton* were an offset directly applied against the purchase price, that fact was unimportant to the judges on the *Hutton* decision, whose main concern was in justifying the *fact* of the compensation,[5] not the particular *way* that the plaintiffs would enforce it.

Finally, we must note *Stratton v. Tejani, supra*, 139 Cal.App.3d 204, also from the same era of extraordinarily high interest rates as *Hutton*. The facts in

---

[5] As Witkin points out, the underlying assumptions in *Hutton* were soon questioned in *Stratton v. Tejani* (1982) 139 Cal.App.3d 204, 214 [187 Cal.Rptr. 231], as giving a windfall to the buyers (since most people do not hold residential real estate for more than 10 years, not the 30 on which the differential was calculated in *Hutton*). (See 13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 27, pp. 316–317.)

*Stratton* were complicated by an agreement on the part of the buyers to lease the residence from the sellers with an option to buy, hence there were a variety of credits and offsets reminiscent of a family law case involving one spouse's stayover in the family residence. In sorting out the "offsetting claims" of the competing parties, the *Stratton* court concluded that the buyers would be entitled to a credit for rents and profits on the property (cf. *Ellis, supra,* 60 Cal.2d 206), offset by the value of their retained purchase funds. The sellers were entitled to interest on the entire purchase price less the total of the option price and cash deposited into escrow, but there was a ceiling on the sellers, limited to the rents and profits, lest they profit from their own breach. (*Stratton, supra,* 139 Cal.App.3d at pp. 213–214.) The court also set forth rules to compensate the buyers for the increase in interest rates during the pendency of the sellers' nonperformance, albeit calculated only on their "anticipated time of possession rather than [as in *Hutton*] the life of their loan." (*Id.* at p. 215.)

To be sure, while the foregoing cases do not deal with propriety of the offset as such, they do appear to be animated by the principle that monetary relief incidental to specific performance is intended to, in essence, restore relations between the parties to what they would have been absent the breach, which is perhaps some inferential support for the offset mechanism. (See *Ellis, supra,* 60 Cal.2d at p. 220 ["The guiding principle with respect to the calculation of the damages incident to the decree of specific performance, as we have seen, is to relate the performance back to the date set in the contract."]; *Hutton, supra,* 128 Cal.App.3d at p. 251 ["Buyers will suffer this increased cost because Sellers failed to perform their obligation to convey the property."]; *Stratton v. Tejani, supra,* 139 Cal.App.3d at p. 212 [" 'The concept of this monetary award to the buyer is *not* to give the buyer *damages* for the seller's breach of contract. Rather, it is designed to relate the performance back to the contract date of performance and to adjust the equities between the parties because of the delayed performance by the seller.' "]; *Bravo, supra,* 168 Cal.App.3d at p. 213 [" 'Since the time for performance has passed, the court relates that performance back to that date, by treating the parties as if the change in ownership had taken place at that time.' "].)

To reiterate, though, it is significant that none of the these cases involved any challenge to the fact that some monetary relief, incidental to the specific performance decree, was being *directly deducted* from the purchase price as distinct from enforced some other way. The focus of each case was the relief itself (or, in *Dennis,* the relief *qua* a supposed change in final judgment). The most we can derive from these cases for our purposes here is a tendency for judicial acquiescence toward direct deductions (as in *Dennis*) as a kind of rough justice in contexts when the issue hasn't been directly raised.

Moreover, it is noteworthy that none of these cases involved offsetting a contractual *attorney fee* award against the purchase price. The trial court's inclusion here of such an enforcement mechanism for contractually owed attorney fees thus appears to be, literally, unprecedented.

### III. CAN A SPECIFIC PERFORMANCE JUDGMENT PROVIDE THAT ATTORNEY FEES ARE TO BE DEDUCTED DIRECTLY FROM THE PURCHASE PRICE?

Unprecedented, however, does not necessarily mean incorrect. As noted above, there is a powerful argument for what the trial court did. The "monetary relief incidental" cases *do* illustrate the goal of equity courts to restore things as if there had never been a breach or, to use the obvious metaphor for restoration *ab initio*, put Humpty Dumpty back together again. Hence we find broad judicial rhetoric waxing enthusiastic over the "expanded" power of a court in equity to compensate wronged buyers for the "incidental" fallout rained on them by the breaching sellers. (E.g., *Hutton, supra*, 128 Cal.App.3d at p. 249.[6])

In the case before us, for example, there was probably no other way that the Behniwals, the buyers, could be truly restored to the status quo antebellum absent provision for taking their incurred fees off the top of the purchase price. Any other collection mechanism would at the very least entail some additional attorney fees (e.g., the effort necessary to record a copy of the judgment so as to obtain a judgment lien, and that is one of the least expensive ways to enforce a judgment), and, more importantly, would not be guaranteed to be successful. Reading between the lines in the briefs (the sellers, the Mixes, who are elderly, make much over the impact of their homestead exemption in the face of the trial court's judgment), we gather that it is an open secret in this litigation that the sellers will not be good for the entire $250,000-plus attorney fee award if that amount isn't collected first by way of deduction from the $540,000 purchase price.

■ However, powerful as it first appears, the argument fails upon closer scrutiny. The first reason is that, in substance, an attorney fee award sought by a successful buyer in a specific performance action is not a true "incident"

---

[6] After noting that no precedent justified relief by way of compensation for interest rate differentials, the *Hutton* court started building up steam in the opposite direction: "However, we conclude that in the circumstances of this case Buyers should receive compensation for the difference in interest rates. Specific performance is an action in equity. In a world of change, equitable remedies have been expanded to meet increasing complexities. Equity is not bound by rigid precedent, but has the flexibility to adjust the remedy in order to do right and justice." (*Hutton, supra*, 128 Cal.App.3d at p. 249.)

to the judgment for specific performance. The attorney fee award (as distinct from, say, an adjustment for interest rate differentials to compensate for the lost time of performance on the contract to convey) is itself a matter of simple contract and the prevailing party's right to its fees is *under the contract* in conjunction with section 1717 of the Civil Code,[7] which governs attorney fees awarded under contract. (Which, we would guess, is perhaps the reason for the paucity of precedent on the scenario before us—up until now, courts have treated the fee issue by itself and not merged it into the incidents of specific performance.)

Nor can, as we soon show, such an award be characterized as an "incident" of the specific performance judgment on the theory that the attorney fee provision is a mere "cost" authorized by statute. The logic for such a result goes like this: Attorney fees recoverable under contract are deemed "costs" under Civil Code section 1717 and Code of Civil Procedure section 1033.5; *Dennis* shows that "costs" awarded in a suit may be offset against the purchase price in a specific performance decree; ergo, attorney fees awarded under contract may be deducted from the purchase price in a specific performance decree. The logic breaks down because, as we will soon show, under *Bank of San Pedro, supra*, 3 Cal.4th 797, contractual attorney fee awards really aren't the sort of "routine" costs that the *Dennis* court dealt with in passing. Rather, they are a separately litigated issue.

The second reason is even more basic. Readers should think of it as yet another example of the law of unintended consequences: Deducting a contractual attorney fee award off the top of the purchase price plays absolute havoc with the law of liens and lien priorities. Under the judgment here, for example, the buyers' attorney fees are being given effective precedence over even government liens for unpaid property taxes and purchase money deeds of trust entered into prior to the litigation. *That* can't be right. And we will hold that it is not.

### A. Awarded Pursuant to Contract, Not Incidental to Performance

In the mid-1980's through the early 1990's, a conflict developed between panels of the Court of Appeal over the issue of just exactly how much of a bond an appellant needed to provide to stay a judgment that provided for attorney fees. The conflict developed analogous authority for us to consult as to what, precisely, is and isn't an "incident" of a judgment.

---

[7] All otherwise undesignated statutory references to sections 1214 and 1717 in this opinion are to the Civil Code. All otherwise undesignated statutory references to sections 704.950, 916, 917.1, and 1033.5 are to the Code of Civil Procedure.

*Pecsok v. Black* (1992) 7 Cal.App.4th 456 [9 Cal.Rptr.2d 12] (*Pecsok*) arose out of a defense judgment in favor of sellers on a buyers' claim for fraud for failing to disclose assessments against the property in a real estate deal. (See *id.* at pp. 457–458.) The judgment included a large attorney fee award of over $63,000; it also included another $4,000 in litigation expenses authorized under the contract upon which the buyers had brought their unsuccessful suit. The judgment further included another some $8,600 in unspecified costs. But the buyers wanted to appeal. Were they required to post an undertaking to stay the judgment? The *Pecsok* court said no. It reasoned that the judgment was only for "costs," and specifically noted the language in section 1717 that makes attorney fees awarded under a contract to a prevailing party an " '*element of the costs of suit*.' " (7 Cal.App.4th at pp. 459–462.) The court noted that "claims for contractual attorney fees need not be pleaded and proved in the main action, but are includable in the post trial cost bill along with other elements of costs." (*Pecsok, supra*, 7 Cal.App.4th at p. 460.) Further, the *Pecsok* court rejected any distinction between " 'routine' " costs—presumably things like the cost of duplicating briefs (as in *Dennis*)—and " 'non-routine' " costs, which the sellers argued included at least expert witness fees. (*Id.* at p. 461.) The court thought that a "bright line rule" treating all costs under Code of Civil Procedure section 1033.5 alike was desirable as "reasonable and simple to apply." (7 Cal.App.4th at p. 462.) Since the judgment was not "for money" and did not direct "the payment of money" as the phrase was used in section 917.1, the buyers were entitled to an automatic stay under section 916. (See *Pecsok, supra*, 7 Cal.App.4th at p. 462.)

To the same effect as *Pecsok* was an earlier decision, *Nielsen v. Stumbos* (1990) 226 Cal.App.3d 301 [276 Cal.Rptr. 272], another action in which the defendants prevailed and could look to an attorney fee clause in the governing contract to recover their fees. Thus, while the judgment provided that the plaintiffs should take nothing, it also provided that the defendants should recover their costs and attorney fees, which totaled more than $33,000. The *Nielsen* court squarely held that attorney fees were an element of costs, should be treated as such, and were therefore not a money judgment enforceable during the pendency of an appeal absent bond. (See *id.* at pp. 304–305.)

Arrayed against *Pecsok* and *Nielsen* was *Chamberlin v. Dale's R.V. Rentals, Inc.* (1986) 188 Cal.App.3d 356 [232 Cal.Rptr. 785]. *Chamberlin* involved a consignment contract with an attorney fee clause. The owner of a recreational vehicle (RV) ended up suing an RV renter, and obtained a compensatory and punitive damage award for breach of contract, conversion and breach of fiduciary duty. The owner's cost memorandum included about $13,000 in attorney fees pursuant to the contract. The RV renter appealed the judgment, and the issue arose as to whether the amount of surety undertaking necessary

to stay execution of the judgment pending appeal had to account for the attorney fees in the memorandum of costs. The RV renter's theory was that since section 1717 defined its attorney fee award as "costs," there was no necessity to bond them. (See *Chamberlin, supra,* 188 Cal.App.3d at pp. 359–360.) The trial court thought differently, and its order was upheld by the Court of Appeal. In language that, literally, echoed that of the *Kamper* decision discussed above, the *Chamberlin* court distinguished attorney fees from the "types of costs awarded in virtually every case" because those types of costs do "not pass on matters directly involved in the litigation but instead were merely incidental to litigated issues." (*Chamberlin, supra,* 188 Cal.App.3d at p. 361; cf. *Kamper v. Mark Hopkins Inc., supra,* 78 Cal.App.2d at p. 888 [the original judgment was the " 'real' " one because it was the judgment " 'passing upon the matter directly involved in the litigation' "].) Focusing on the nature of attorney fees awarded under a contract, the *Chamberlin* court said, "Unlike the costs involved in the early cases, such attorney fees are in the nature of a directly litigated issue rather than merely incidental to the judgment." (*Chamberlin, supra,* 188 Cal.App.3d at p. 362.)

The Supreme Court resolved the conflict in *Bank of San Pedro, supra,* 3 Cal.4th 797, which arose out of a large award of expert witness fees (more than $116,000) pursuant to a settlement statute providing for such fees if a defendant makes a settlement offer and the plaintiff does not do better than the offer if the case goes to trial (section 998 of the Code of Civil Procedure). The unsuccessful plaintiff appealed, and maintained that the defendant's attempt to enforce the expert witness fee award was automatically stayed—after all, the judgment was "for only costs" and therefore subject to the statutory automatic stay provision. (*Bank of San Pedro, supra,* 3 Cal.4th at p. 802.)

However, the Supreme Court held otherwise, making three points that, as it turns out, are applicable to the case before us now. First, the court said expert witness fees—and in the process lumped attorney fees into the same category—are not "routine" costs. They are a directly litigated issue.[8] Second, expert witness fees (and surely, we can add, attorney fees) are always a matter of trial court discretion, even if awarded as a matter of right.[9] Third,

---

[8] The applicable passage from *Bank of San Pedro* demonstrates that the high court equated attorney fee awards with the expert witness award before it, and said both were nonroutine: "The Court of Appeal in this case correctly explained that, 'Expert witness fees, like attorneys' fees, are not ordinarily a part of costs awarded at trial. Further, the award of expert witness fees (1) is not the type of cost included in virtually every case and (2) was a directly litigated issue, as opposed to being an incidental matter. . . . It would be a distortion of reality to classify expert witness fees as [routine] costs.' We agree." (*Bank of San Pedro, supra,* 3 Cal.4th at p. 803, *Bank of San Pedro* court's insertion of the brackets.)

[9] Here is the relevant passage: "Second, even when a defendant is entitled as a matter of right to other costs under section 998, subdivision (c), an award of expert witness fees is

the *Bank of San Pedro* court noted that a judgment directing the payment of expert witness fees is in substance a judgment for the payment of money,[10] a point also underscored in the court's approval of language from the Court of Appeal's decision that it is a "distortion of reality" to view expert witness fees as routine costs.[11]

We recognize, of course, that the present case is *not* about whether a bond is required for an attorney fee award included in a judgment, but the Supreme Court's resolution of the expert fee matter in *Bank of San Pedro* renders the buyers' logic here untenable: In light of *Bank of San Pedro*, they cannot claim that their attorney fee award is merely a "routine cost" included in the judgment, deductible from the purchase price the same way that the costs of duplication of reply briefs were deductible in *Dennis*.

■ Further, the three points concerning the nature of fees awarded pursuant to right and otherwise described as "costs" under sections 1717 and 1033.5 cannot be ignored: The attorney fee award here was a directly litigated issue; it was the subject of a full hearing on remand. Also, attorney fee awards are always matters of discretion, even when a litigant has a right to them. (Courts never award unreasonable attorney fees.) Indeed, in our prior opinion we specifically directed that the attorney fee issue be heard by the same judge who presided over the trial of the case precisely because she was the judicial officer in the absolute best position to exercise *discretion* as to the reasonableness of any fees claimed. And, looking to the substance of the thing, there is no denying that a judgment which provides for $250,000 to be paid directly from the proceeds of a purchase price is, as the *Bank of San Pedro* said, an order directing the payment of money by "any practical or semantic measure." (*Bank of San Pedro, supra,* 3 Cal.4th at p. 804.)

We need only add that, in distinguishing directly litigated issues (like expert witness fees and attorney fees) from "routine" costs, the *Bank of San Pedro* decision validated a distinction impliedly drawn by the *Kamper v. Mark Hopkins, Inc., supra,* 78 Cal.App.2d 885 decision 45 years previously: The "real" judgment is matter "directly involved" in the litigation, as distinct from, say, a true incidental like the per page cost of duplicating a reply brief.

---

always within the trial court's discretion. This is in contrast to the costs awarded under section 1032, subdivision (b) which costs are awarded 'as a matter of right.' " (*Bank of San Pedro, supra,* 3 Cal.4th at p. 803.)

[10] Here is the relevant passage: "First, a judgment directing the payment of expert witness fees is—by any practical or semantic measure—a judgment directing the payment of money and is therefore consistent with the language of section 917.1, subdivision (a) which provides that such a judgment is *not* automatically stayed." (*Bank of San Pedro, supra,* 3 Cal.4th at p. 804, original italics.)

[11] The passage is quoted in footnote 8 above.

And then there is the reality of the situation: The contract right to attorney fees here amounts to over $250,000, which is almost half the price of the property several years ago. It seems a little otherworldly to say that such an amount in this context is merely an "incident" of the judgment.

In sum, in terms of this litigation involving the issue of whether an attorney fee award is a mere "incident" of the judgment for specific performance, the answer is a clear no.

### B. No Ad Hoc Creation of "Super-Liens"

#### 1. Deductibility of Attorney Award from Purchase Price Incorrect Generally

■ A lien is defined in the Civil Code as "a charge imposed in some mode other than by a transfer in trust upon specific property by which it is made security for the performance of an act." (§ 2872.) The definition fits here both semantically and practically. Semantically, by structuring the judgment so that the purchase price of the property is reduced by the amount of the attorney fee award, the trial judge effectively levied a "charge . . . other than by transfer in trust" upon "specific property," making that property "security" for the "performance" of the payment of the attorney fee award. Practically the case is even stronger: There can be no doubt that the judgment *functions* as a lien by giving the buyers and their attorney first dibs on any proceeds from the sale of the property.

■ A few basics need to be noted though. A judgment lien is not created until an abstract of judgment has been filed. (Code Civ. Proc., § 697.310, subd. (a) ["Except as otherwise provided by statute, a judgment lien on real property is created under this section by recording an abstract of a money judgment with the county recorder."].) And we can say with confidence that no judgment (at least one providing for the buyers to recover their attorney fees; remember that the judgment we reversed in the earlier litigation was adverse to them) existed in this case until after the filing of the judgment on remand.

Even assuming that the sellers or their attorney were to act with the absolute quickest dispatch possible,[12] a judgment lien based on the attorney fee award would have lower priority than any existing liens on the property.

---

[12] In this case we do not have occasion to pass on the question of whether a judgment lien can be created prior to a judgment's becoming final (as distinct from prior to its having just been entered), so it is irrelevant for this case whether the buyers recorded an abstract of judgment upon entry of the judgment under review or are still waiting to record one upon the finality of this appeal.

Code of Civil Procedure section 704.950 provides in its entirety: "(a) Except as provided in subdivisions (b) and (c), a judgment lien on real property created pursuant to Article 2 (commencing with Section 697.310) of Chapter 2 does not attach to a declared homestead if both of the following requirements are satisfied: [¶] (1) A homestead declaration describing the declared homestead was *recorded prior to the time the abstract or certified copy of the judgment was recorded to create the judgment lien.* [¶] (2) The homestead declaration names the judgment debtor or the spouse of the judgment debtor as a declared homestead owner. [¶] (b) This section does not apply to a judgment lien created under Section 697.320 by recording a certified copy of a judgment for child, family, or spousal support. [¶] (c) A judgment lien attaches to a declared homestead *in the amount of any surplus over the total of the following*: (1) *All liens and encumbrances on the declared homestead at the time the abstract of judgment or certified copy of the judgment is recorded to create the judgment lien.* (2) The homestead exemption set forth in Section 704.730." (Italics added.)

The import of section 704.950 is clear given the facts before us. There could be no judgment lien before the judgment now being appealed (else what "abstract" of it could be recorded?) and any judgment lien based on the attorney fee award is lower in priority than the combined amount of the preexisting liens on the property at the time of recording and the amount of the homestead exemption (currently $150,000 for the Mixes).[13] By providing for money off the top of the sales price, the judgment effectively circumvented the statute.

To illustrate our point, consider the havoc that would follow if the idea of deducting an attorney fee award were a general rule that a court might apply in any specific performance case. For example, suppose there were an ordinary specific performance action in which the breaching sellers had a purchase money first mortgage on the property taken out well prior to the litigation. To allow a deduction from the purchase price for the buyer's attorney fee award would play absolute havoc with the established expectations of third party lenders. All of a sudden, the "cushion" between what they were owed and the value of the property would disappear.

Indeed, something of the sort almost happened in Los Angeles before the Court of Appeal set things right in *Isaac, supra,* 66 Cal.App.4th 586.

*Isaac* arose from an impulse, not unlike that of the trial judge's here, to absolutely ensure that a certain claimant recovered its claim from a debtor's

---

[13] Since at least one of them is over 65 years old, section 704.730, subdivision (a)(3)(A) of the Code of Civil Procedure applies, which makes the exemption $150,000.

existing equity in given real property—except that in *Isaac* the underlying debt was any unpaid municipal utility charge, as distinct from a contractual attorney fee award. A city council passed an ordinance providing for the imposition of special assessment liens on master-metered apartment buildings for the collection of estimated past due and future billings for (city-owned) water and electricity. *And* the ordinance provided that such liens would have priority over all previously recorded deeds of trust and other liens and encumbrances against the property. (*Isaac, supra,* 66 Cal.App.4th at pp. 591–592.) In effect, as various lenders noted and the appellate court quoted them, the city had created a " 'super-priority' lien." (*Id.* at p. 593.)

The appellate court upheld the trial court in striking down the ordinance, on the grounds of conflict with state statutory law. State law gives priority generally to liens according to the time of their creation (*Isaac, supra,* 66 Cal.App.4th at pp. 600–601), liens for taxes are "paramount," and utility liens have the same priority as lesser judgment liens. (*Id.* at p. 601.) The city council's super-priority utility lien disrupted that "balance by giving what is essentially a judgment lien priority normally accorded only to tax liens." (*Ibid.*)

The same analysis applies here. If an attorney fee *award* can be deducted from the purchase price, all sorts of mischief are possible: Tax liens, even purchase money mortgageholders who lent money *prior* to the pending action, would literally take second place to an unliquidated obligation that did not exist until the conclusion of the litigation.

### 2. *And Under the Particular Circumstances of This Case*

Interestingly enough, though, the case before us does not involve the typical situation where a breaching seller has taken out a mortgage before the litigation. Instead, the property was encumbered three times *after* the litigation got started. Specifically, after the notice of lis pendens was filed in October 2002, the sellers consented to three deeds of trust being recorded against the property: Deed of trust No. one was dated April 15, 2003, in favor of World Savings Bank (initial amount $238,000). Deeds of trusts Nos. two and three (respective dates: June 2003 and November 2005) were recorded in favor of their present attorney (initial amounts $35,000 each). Figuring a $150,000 homestead exemption (the declaration was recorded in March 2003), the base totals ($238,000 plus $35,000 plus $35,000 plus $150,000) add up to about $458,000, or more than 84 percent of the selling price of $540,000.

Should the fact that the sellers encumbered the property after a notice of lis pendens was filed make any difference as to whether the attorney fee award

could be deductible off the top? The buyers suggest in their briefs that the attorney fee award should, in essence, be given priority to the proceeds of the sale because their notice of lis pendens preceded the three mortgages now on the property. In effect, they assert that their judgment for attorney fees is a lien that relates back to the time of the filing of the notice of lis pendens.

We must conclude otherwise, however.

■ At this point it is necessary to emphasize the difference between a money judgment which can be the basis of a judgment lien and litigation involving a "real property claim" that can be the basis of a notice of lis pendens. As this court (indeed, this very panel) said in *Gale v. Superior Court* (2004) 122 Cal.App.4th 1388, 1396 [19 Cal.Rptr.3d 554], "The whole idea of a notice of lis pendens is to give constructive notice of the legal proceeding affecting title to a specific piece of property. . . . Thus a potential buyer of the property should be able to go to the courthouse and *look up* the documents (the pleadings) in the court proceeding which might affect title or possession of the real property he or she is thinking of buying or lending money on." Elsewhere in that decision we emphasized that the filing of a notice of lis pendens allows third parties to "*ascertain from the pleadings* the nature of any claim to specific real property." (*Ibid.*)

We thus ask: In the case before us, what would a potential lender have found—indeed what did World Savings find—upon going to the courthouse and looking up the file and ascertaining the "nature of the claim" from the pleadings? Such a lender would have found an action for specific performance which, if successful, would guarantee payment to the sellers of $540,000.

■ Now, as our high court made clear in *Ellis*, an action for specific performance *affirms the contract and asks that it be performed.* (*Ellis, supra,* 60 Cal.2d at pp. 219–220.) A buyer or moneylender, then, could have reasonably relied on the buyers' own pleadings to conclude that, should the buyers be successful, the court would force the sellers to convey the property for the contract price of $540,000. True, if one actually bought the property in fee, one's interest would be subject to the ongoing litigation contemplating a forced sale for $540,000. *But*—a lender could also reasonably rely on the pleadings to conclude that the property could be safely encumbered *up to* that $540,000 amount.

To be sure, the pleadings also gave notice of a potential (and large) attorney fee award—a point stressed by the buyers in this appeal. But a contractual attorney fee award is, as we have seen, a money judgment. Consider: A contractual attorney fee award in a breach of contract action for

undelivered widgets is the same as a contractual attorney fee award in a specific performance action—a payment of money that the parties contemplated in the very making of the contract. One could not say, then, that a judgment lien based on a contractual attorney fee award somehow "related back" to the notice of lis pendens the way that the decree of specific performance related back. To resort to the analogous problem of how an attorney fee award fits in the stay-on-appeal statutes, the *Chamberlin* decision took the position that a contract fee award was a money judgment as distinct from an equitable order otherwise stayed. That position found favor with the Supreme Court in *Bank of San Pedro* and we find the latter case to apply in this context as well—practically and semantically a contractual attorney fee award walks, talks and quacks like a money judgment. Two of the three factors on which the *Bank of San Pedro* court relied also point in this direction: The amount of money owing from the defendants to the plaintiffs was directly litigated, and the substance of the award is a judgment for payment of money. (Consider that the buyers' judgment lien will apply to other property in the county besides the property that was subject to the specific performance action, and we doubt that the buyers would have it any other way!) And the final factor—trial court discretion in fixing the amount of fees—is at least neutral in that it again emphasizes that the issue of the attorney fees was something directly before the trial court in its own right, as distinct from a fixed figure that automatically followed in the train of judgment.[14]

The distinction we have just drawn, between the litigation affirming the contract and seeking specific performance and the collateral attorney fee award enforceable as a money judgment, also solves an issue raised by the buyers regarding the effect of section 1214 of the Civil Code. The buyers read section 1214 for the proposition that all the post-lis pendens encumbrances should simply disappear.

Section 1214 provides in its entirety: "Every conveyance of real property or an estate for years therein, other than a lease for a term not exceeding one year, is void as against any subsequent purchaser or mortgagee of the same property, or any part thereof, in good faith and for a valuable consideration, whose conveyance is first duly recorded, and as against any judgment affecting the title, unless the conveyance shall have been duly recorded prior to the record of notice of action."

The key words are "against" and "judgment affecting the title." To the degree that the subsequent mortgagees claim interests in the property up to

---

[14] Again, we emphasize that all attorney fee awards must pass muster as "reasonable," hence our remand specifically to the judge best equipped to evaluate reasonableness. It may be that the amount incurred on a pure hourly rate times hours basis is reasonable, and the court may grant 100 cents on the bill, but that isn't *necessarily* the case.

the $540,000 payment contemplated by the "judgment affecting the title," the conveyances they hold are *consistent* with the buyers' status as subsequent purchasers who gave notice of their specific performance action prior to the mortgages. The mortgagees simply had notice that if the litigation was successful their interests were *limited* to $540,000 in value. Of course, any other result would, of course, be highly inequitable because it would subvert the reasonable expectations created by the buyers' own pleadings.

On the other hand, section 1214 also answers a point that the sellers make, which is the suggestion that if the claims secured by the current mortgages exceed $540,000, escrow simply will not be able to close since the current lienholders will not "release" their claims on the property. (Given that two of those mortgages secure a debt for attorney fees and the meter is running as we write, that is not a wholly unlikely scenario.) Any claim to an interest surviving the $540,000 sale contemplated in the pleadings *is* a "conveyance" inconsistent with the pleadings and a contemplated judgment requiring title to be turned over to the subsequent purchaser. Indeed, it would be ridiculous if a specific performance action could be thwarted by running up a secured attorney fee award that went beyond the sale price of the property—and yet that is, though not quite so baldly stated, a position that the sellers assert in their briefs.

On remand, therefore, we direct the trial court to incorporate language in the judgment to the effect (and such that any escrow officer can implement the sale) that any postnotice of lis pendens encumbrances against the property are "void" as a matter of law *after* the first $540,000. Also, we should point out that in implementing the judgment, no issue of homestead will arise: Because the first, second, and third mortgages are all consensual, the homestead exemption will not apply. (See Ahart, Cal. Practice Guide: Enforcing Judgments and Debts (The Rutter Group 2006) ¶ 6:1016, p. 6E-53 ["The exemption does not apply where a lien *other than an enforcement lien* is being foreclosed . . . ."].) In practical effect, this means that of the $540,000 that the Behniwals must pay the Mixes for the property, World Savings will get paid first, and their attorney second, with the Mixes allocated the remainder, even if it is less than their homestead exemption.

We take a small digression at this point to note that this case is almost a parable of what can happen when disputes are not settled. Lincoln's dictum about the winner being the loser and the loser being the loser in litigation has been vindicated again. In our last opinion we advised the parties to settle, noting that real pain would be visited upon the Mixes in light of the specific performance judgment to come. At that point both parties might still have salvaged some of the money that would otherwise be lost to attorney fees. The fact that the Mixes, as sellers, obtain a partial reversal of the judgment in

this appeal is going to be cold comfort given that they are likely to have almost nothing to show for the sale by way of proceeds and will still have a large attorney fee "judgment" hanging over them. On the other hand, the Behniwals, as buyers, lose the chance to have their attorney fees paid from the proceeds of the sale of the property and who knows what chances they or their attorney will have to collect on any remaining (collectible, that is, nonexempt) assets the Mixes still have. Shades of Dickens's famous Jarndyce v. Jarndyce (nothing left of the estate after attorney fees were paid), the big winner is the attorney for the sellers, who will be paid from the surplus of the proceeds of the $540,000 sale after World Savings takes it share. The case is nothing less than a parable that settlement judges may wish to tell warring litigants who would be better off settling with their adversaries quickly.

### IV. FINAL ISSUE: WAS THE ATTORNEY FEE ORDER CORRECT IN THE FIRST PLACE?

The $250,000-plus attorney fee award includes amounts incurred by the buyers pursuing the sellers' real estate broker and her company under the "tort of another" doctrine. (Readers who read the last opinion will recall that the whole deal got off to a bad start when the broker *forged* the signatures of the sellers on a counteroffer, but then the sellers ratified the deal by signing other papers referencing *the* deal that they had just made.) In this appeal the sellers argue that the attorney fee clause in the real estate contract (operative words: "Between Buyer and Seller arising out of this agreement") could not include the buyers' fees spent pursuing the real estate broker.

The issue is disposed of by the doctrine of law of the case. The last opinion addressed *that point specifically*: "That claim [on the part of the Behniwals for attorney fees to be litigated on remand] surely entails *at least* the amount of the 'tort of another' fee award that the trial court awarded the Behniwals from Seidenberg and Prudential." (*Behniwal v. Mix, supra*, 133 Cal.App.4th at pp. 1043-1044, original italics.) The last decision, being a final judgment, cannot now be challenged on that point.

In addition to law of the case, we merely add that the fees spent pursuing the real estate broker and her company did indeed "arise out" of the contract—indeed directly from the signed contract given the initial (but later ratified) forgery. The fees were incurred, as it turned out, pursuing the sellers' *agents*, who acted, when all was said and done, at the sellers' behest.

### V. CONCLUSION

All provisions in the judgment contemplating the deductibility or offset (or setoff) of the buyers' attorney fee award from the $540,000 purchase price of

the property are reversed, with directions that the judgment should be corrected to provide for specific performance as contemplated in the contract: The Behniwals pay the Mixes $540,000 and the Mixes convey the property. In all other respects—particularly the amount of the fee award—the judgment is affirmed. Obviously this decision is without prejudice to the Behniwals as regards other appropriate remedies by which they may wish to collect on the attorney fee award. However, because they are the substantially prevailing parties in this appeal, the Mixes shall recover their costs in this appeal, costs that can be characterized, ironically enough, as "routine."

Rylaarsdam, J., and Ikola, J., concurred.

A petition for a rehearing was denied March 6, 2007.